IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ETIMINE USA INC.,

                 *Plaintiff*,

    v.

GOKHAN YAZICI and YZC CONSULTING
LTD.,

                 *Defendants*.

Civil Action No. 2:20-cv-713

Hon. William S. Stickman IV

## <u>MEMORANDUM OPINION</u>

WILLIAM S. STICKMAN IV, United States District Judge

Plaintiff Etimine USA Inc. ("Etimine USA") filed its Amended Complaint against Defendants Gokhan Yazici ("Yazici") and YZC Consulting Ltd. ("YZC") (collectively, "Defendants") alleging an action for (a) violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 (Counts I, II); (b) violations of the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. C.S.A. § 5301 (Counts V, VI); (c) breach of contract (Counts III, IV); and (d) conversion (Counts VII, VIII). (ECF No. 18, ¶ 8). Defendants moved to dismiss the Amended Complaint under Federal Rule of Civil Procedure ("Rule") 12(b)(6) for failure to state a claim upon which relief may be granted. (ECF No. 20). For these reasons, the Court denies Defendants' Motion.

## FACTUAL AND PROCEDURAL HISTORY

Etimine USA is a distributor of boron products including mineral ores, boric acid, sodium borates and other products. (ECF No. 18, ¶ 15). Etimine USA ships its products from the Republic of Turkey for use in interstate and foreign commerce. (*Id.*). Boron products are used globally in

1

various industries including agriculture, cleaning, metallurgy, ceramics, wood protection, glass, insulation, textile fiberglass and energy. (*Id.* ¶ 16). According to Etimine USA, "[t]he global reserves of boron are limited and, thus, the boron mining industry is an extremely competitive and limited market . . . ." (*Id.* ¶ 17).

Etimine USA employed Yazici for several years as its General Manager beginning in 2003. (*Id.* ¶ 1). Yazici also served on Etimine USA's Board of Directors. (*Id.* ¶ 19). During his employment, Yazici had access to all company information including Etimine USA's proprietary information (e.g., logistics, distribution information, production costs and sales margins), which also belonged to Etimine USA's holding company and other subsidiaries globally. (*Id.* ¶ 21). The information included logistical expertise necessary for Etimine USA's pricing of its products for its U.S. and multi-national customers. (*Id.*). Etimine USA's profit margins rely heavily on its logistics network, and the logistics information is vital for its competitive edge. (*Id.*).

The proprietary information, which Etimine USA provided to Yazici during his employment, allowed Etimine USA to compete in the limited boron market. (*Id.* ¶¶ 23, 24). The information derived actual or potential economic value from it not being known to nor readily ascertainable by other persons, including Etimine USA's competitors. (*Id.* ¶ 24). According to Etimine USA, the proprietary information "would be of significant value to competitors in the industry." (*Id.*).

In February 2012, Etimine USA and Yazici entered into the Employment Agreement for Yazici's continued employment as Etimine USA's President and Chief Executive Officer. (*Id.* ¶ 26). The Employee Agreement provided:

> [Yazici] agrees, during and subsequent to the Term of this Agreement, not to make or use, for his own benefit or the benefit of any party other than the Company, nor to divulge to anyone other than duly authorized personnel or representatives of the Company, any information or knowledge relating to the business, business methods

or techniques of the Company, including, but not limited to, information about accounting procedures, sales prospects, customers' or suppliers' lists, bidding formula, sales, profits, costs, systems, concepts or similar matters owned by or known to the Company, except to the extent that the same generally known to the public or recognized as standard practice in the businesses in which the Company is engaged or is otherwise known to or disclosed to Executive by a third party not bound by any covenant of confidentiality.

Executive and the Company agree that any breach or evasion of the terms of this Section 8 will result in immediate and irreparable harm to the Company. Therefore, in the event of any controversy concerning the rights or obligations of the parties under this Section 8, the Company shall be entitled to obtain an injunction and/or specific performance as well as any other legal or equitable remedy necessary in order to compel compliance with this Section 8. Such remedies, however, shall be cumulative and nonexclusive and shall be in addition to any other remedy or remedies to which the Company may be entitled.

(*Id.* ¶ 29). The Employee Agreement required Yazici to return all Etimine USA property, in any form, to Etimine USA upon the termination of his employment. (*Id.* ¶ 30).

In 2013, Etimine USA distributed an Employee Handbook with a letter from Yazici welcoming all new employees. (*Id.* ¶¶ 31–33). The Employee Handbook required employees to maintain the information of Etimine USA in strict confidence:

Protecting our company's information is the responsibility of every employee. Do not discuss the company's confidential business or proprietary business matters, or share confidential, personal employee information with anyone who does not work for us such as friends, family members, members of the media, or other business entities.

(*Id.* ¶ 34). Etimine USA required its employees, at the end of employment with Etimine USA, to return all information to Etimine USA and reserved the right to pursue legal action for any violations of its exit policies. (*Id.* ¶¶ 34, 36).

Yazici left Etimine USA in January 2017 and later filed a complaint, styled *Yazici v. Etimine USA, Inc.*, No. 17-010331, against Etimine USA in Court of Common Pleas of Allegheny County, Pennsylvania ("Post-Employment Lawsuit"). (*Id.* ¶¶ 37–38).

In November 2018, Etimine USA and Yazici entered into a Separation Agreement, resolving the Post-Employment Lawsuit. (*Id.* ¶ 39). Yazici agreed to not share any of Etimine USA's proprietary information with any third parties. (*Id.* ¶¶ 40–42).

Soon after, Yazici formed YZC Consulting Ltd. (*Id.* ¶ 43). Etimine USA alleges Yazici, through his work with YZC, disclosed and used Etimine USA's proprietary information for his benefit and the benefit of Etimine USA's competitors. (*Id.* ¶ 47). One of Etimine USA's direct competitors hired a former sales agent of Etimine USA who informed the direct competitor that Yazici was unhappy with Etimine USA. (*Id.* ¶¶ 49–50). The direct competitor arranged a meeting with Yazici and YZC where Yazici divulged Etimine USA's proprietary information, including customers' information, profit margins, logistics information, logistical matrixes and details of its global sourcing and distribution network. (*Id.* ¶¶ 51–52). A different, former Etimine USA employee also attended the meeting. (*Id.* ¶ 53). Sometime after the meeting, YZC provided consulting services to the direct competitor. (*Id.* ¶ 55). Defendants disclosed Etimine USA's proprietary information throughout its consultation services with the direct competitor, which the competitor knew was proprietary information. (*Id.* ¶¶ 56–57).

## STANDARD OF REVIEW

A motion to dismiss filed under Federal Rule of Civil Procedure ("Rule") 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A plaintiff must allege sufficient facts that, if accepted as true, state a claim for relief plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court must accept all well-pleaded factual allegations as true and view them in the light most favorable to a plaintiff. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009); *see also DiCarlo v. St. Marcy Hosp.*, 530 F.3d 255, 262–63 (3d Cir. 2008). Although

a court must accept the allegations as true, it is "not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (citations omitted).

The "plausibility" standard required for a complaint to survive a motion to dismiss is not akin to a "probability" requirement but asks for more than sheer "possibility." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). In other words, the complaint's factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations are true even if doubtful in fact. *Twombly*, 550 U.S. at 555. Facial plausibility is present when a plaintiff pleads factual content that allows a court to draw the reasonable inference that a defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. Even if the complaint's well-pleaded facts lead to a plausible inference, that inference alone will not entitle a plaintiff to relief. *Id.* at 682. The complaint must support the inference with facts to plausibly justify that inferential leap. *Id.*

Generally, a court may not consider an extraneous document when reviewing a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). If parties present matters outside the pleadings and the court does not exclude them, the motion must be converted to a motion for summary judgment. *See* Fed. R. Civ. P. 12(d). When reviewing the sufficiency of a complaint, however, a court may consider attachments to it without converting the motion into one for summary judgment if they are integral to the allegations in the complaint and are authentic. *See In re Burlington*, 114 F.3d at 1426 (holding that a court may consider a "document integral to or explicitly relied upon in the complaint"); *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994) (same); *Fallon v. Mercy Cath. Med. Ctr. of Se. Pa.*, 877 F.3d 487, 493 (3d Cir. 2017) (same); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit

to a pleading is a part of the pleading for all purposes."); *see also Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (holding that a court may consider an "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document").

## ANALYSIS

### I.    Plaintiff's Claims Are Not Precluded by the Separation Agreement.

Under the Separation Agreement entered into by both parties after the Post-Employment Lawsuit, the limited release applies to those claims "arising out of, based on, or relating in any way to any acts omissions . . . , including the claims asserted in the [Post-Employment Lawsuit] but excluding any claims premised upon (i) fraud, (ii) violation of law, or (iii) violation of this Agreement." (ECF No. 21-1, ¶ 3(e)).    The Court should "interpret a release so as to discharge only those rights intended to be relinquished.    The intent of the parties must be sought from a reading of the entire instrument, as well as from the surrounding conditions and circumstances." *Vaughn v. Didizian*, 648 A.2d 38, 40 (Pa. Super. 1994); *see also Fortney v. Callenberger*, 801 A.2d 594, 597 (Pa. Super. 2002) (admonishing that releases should be strictly construed "so as not to bar the enforcement of a claim that had not accrued at the date of the execution of the releases").

Pennsylvania[1] contract law recognizes the "firmly settled" point that "the intent of the parties to a written contract is contained in the writing itself."    *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 92–93 (3d Cir. 2001) (quoting *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. 1993)).    When parties' intent is clear, a court need not "resort to extrinsic aids or evidence."    Rather, the meaning of a clear and unequivocal written contract "must be determined by its contents alone."    *Id.*    When interpreting a release, Pennsylvania courts

---

[1] Pennsylvania law governs the Separation Agreement.    *See* (ECF No. 1, ¶¶ 9, 10).

"traditionally determine[] the effect of a release using the ordinary meaning of its language *and* interpret[] the release as covering 'only such matters as can fairly be said to have been within the contemplation of the parties when the release was given.'" *Vaughn*, 648 A.2d at 40 (quoting *Dublin by Dublin v. Shuster*, 598 A.2d 1296, 1298–99 (Pa. Super. 1991)). The Court may consider documents attached to a motion to dismiss without converting to a motion for summary judgment if the plaintiff refers to the documents or the documents "are central to the claim . . . ." *Gagliardi v. Fisher*, 513 F. Supp. 2d 457, 471 (W.D Pa. 2007).

The Court may consider the Separation Agreement in the Motion to Dismiss without converting it into a motion for summary judgment as Etimine USA referenced the document in its Complaint and Defendants have incorporated it in their motion. Its contents are central to whether Etimine USA may bring forth this action.

Defendants declare that the Separation Agreement precludes Etimine USA's assertions because the Separation Agreement releases Defendants of all claims before the effective date of the Separation Agreement. (ECF No. 21, pp. 7–8; ECF No. 21-1). Etimine USA contends that its claims do not arise out of nor are they related to the claims asserted in the employment lawsuit. (ECF No. 28, pp. 13–15). The Court agrees. Defendants read the Separation Agreement much too broadly. Etimine USA puts forward five reasons for why the Separation Agreement does not prevent this litigation. First, Etimine USA's claims are unrelated to the Post-Employment Lawsuit. (*Id.* at 14). Second, Defendants and Etimine USA agreed to extend all provisions preventing the dissemination of proprietary information. (*Id.*). Third, the Separation Agreement included an exception for violating laws such as misappropriation under DTSA and PUTSA, conversion and any violations of the Separation Agreement itself. (*Id.* at 14–15). Fourth, Yazici had a continuing

duty to refrain from sharing Etimine USA's proprietary information. (*Id.* at 15). Finally, YZC was not a party to the Separation Agreement. (*Id.*).

A party's duty to refrain from misappropriating trade secrets does not expire after termination from employment. *See Pittsburgh Logistics Sys. Inc. v. LaserShip, Inc.*, 2019 WL 2443035, at *9 (W.D. Pa. June 12, 2019) (determining, regardless of contract language, that a former employee has a continuing duty to refrain from misappropriating trade secrets of the former employer). The Separation Agreement explicitly states, "Employee will not disclose to any third parties any of the trade secrets and other confidential proprietary information of the Company . . . ." (ECF No. 21-1, ¶ 8). Later in the document, the parties agreed that any other enforceable agreement not in conflict with the Separation Agreement "shall remain in effect and the terms of this Agreement shall be in addition to such other such agreements." (*Id.* ¶ 10). The Court holds that the Separation Agreement does not bar Etimine USA's current action against Defendants.

## II.   Plaintiff Adequately Pled Claims for Misappropriation of Trade Secrets under Both DTSA and PUTSA (Counts I, II, V, VI).

Although DTSA and PUTSA use different wording to define a trade secret, both protect the same type of information. They define trade secrets similarly as information that: (a) the owner has taken reasonable means to keep secret; (b) derives independent economic value, actual or potential, from being kept secret; (c) is not readily ascertainable by proper means; and (d) would be of economic value to others who cannot readily access it. 18 U.S.C. § 1839(3); 12 Pa. C.S.A. § 5302.

Pennsylvania courts consider these factors for determining whether information is a protected trade secret:

> (1) the extent to which the information is known outside of the company's business;
> (2) the extent to which the information is known by employees and others involved in the company's business; (3) the extent of the measures taken by the company to guard the secrecy of the information; (4) the value of the information to the

8

company and its competitors; (5) the amount of effort or money the company spent in developing the information; and (6) the ease or difficulty with which the information could be acquired or duplicated legitimately by others.

*Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010). Pennsylvania courts recognize that trade secrets "may consist of any formula, pattern, device or compilation of information . . . ." *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1255 (3d Cir. 1985) (citing Restatement of Torts § 757 cmt. B (1939)).

"Misappropriation" under the DTSA means:

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who—

> (i) used improper means to acquire knowledge of the trade secret;

> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

>> (I) derived from or through a person who had used improper means to acquire the trade secret;

>> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

>> (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

> (iii) before a material change of the position of the person, knew or had reason to know that—

>> (I) the trade secret was a trade secret; and

>> (II) knowledge of the trade secret had been acquired by accident or mistake[.]

18 U.S.C. § 1839(5).

Under the DTSA, the term "improper":

(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and

(B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition[.]

18 U.S.C. § 1839(6).

A claim for misappropriation of trade secrets need not be pleaded with particularity. *See Ideal Aerosmith, Inc. v. Acutronic USA, Inc.,* Civ. A. No. 07-1029, 2007 WL 4394447, at *8 (W.D. Pa. Dec.13, 2007) (finding the plaintiff's complaint sufficient to overcome a Rule 12(b)(6) motion to dismiss). Moreover, whether a plaintiff has taken sufficient measures to protect its trade secrets is a question of fact more appropriately determined with a fully developed record. *Ctr. Pointe Sleep Assocs., LLC v. Panian*, No. CIVA 08-1168, 2009 WL 789979, at *3 (W.D. Pa. Mar. 18, 2009). Courts routinely have found that DTSA and PUTSA protect things such as customer lists, pricing, marketing strategies and financial projections. *See, e.g., Mallet & Co. v. Lacayo*, Civ. No. 19-1409, 2020 WL 6866386, at *7 (E.D. Pa. Nov. 23, 2020) (finding DTSA and PUTSA protect formulas, customer information, certifications, supply source, internal manuals, pricing and volume data); *Freedom Med. Inc. v. Whitman*, 324 F. Supp. 3d 509, 522 (E.D. Pa. 2018) (pricing information); *BIEC Intern., Inc. v. Global Steel Servs.*, 791 F. Supp. 489, 544–46 (E.D. Pa. 1992) (customer lists, cost and price plans, marketing strategies, financial projections, terms of customer accounts).

Courts have denied motions to dismiss for less complex things such as pricing and marketing strategies. *See AlterG, Inc. v. Boost Treadmills LLC*, No. 18-CV-07568-EMC, 2019 WL 4221599, at *1 (N.D. Cal. Sept. 5, 2019) (granting in part and denying in part the defendants' motion to dismiss). The Northern District of California in *AlterG* examined a claim for trade secret misappropriation for the development of a treadmill. *Id.* at *1–2. The court found, as for AlterG's

pricing and marketing strategy trade secret, AlterG had pled with sufficient specificity to overcome the defendants' motion to dismiss. *Id.* at *6. But AlterG's trade secret involving the alteration of commercial treadmills was highly technical. *Id.* at *5–6. The court bifurcated its decision because, unlike pricing and marketing strategies, technical matters demand more specificity. *Id.* Accordingly, the court granted the defendants' motion to dismiss for its more technical trade secret. *Id.*

Etimine USA suggests that it need not plead the specifics of the trade secrets with any greater particularity and the Court agrees. Etimine USA, in its Complaint, outlines its trade secrets to include logistical and pricing information. (ECF No. 21-1, ¶¶ 21, 23). Etimine USA describes its procedures for protecting its trade secrets including the implementation of policies outlined in the Employee Handbook, computer security including password protections and firewalls, procedures for transmitting and storing information, employee training and other measures. (*Id.* ¶ 25). As these claims do not involve a high degree of technicality, the Court finds Etimine USA has pled with sufficient specificity to overcome Defendants' motion to dismiss.

### III.   Plaintiff Adequately Alleged Claims for Breach of Contract (Counts III, IV).

To state a breach of contract claim, Pennsylvania law requires that a plaintiff allege a valid contract, its breach and ensuing damages. *See Ironshore Specialty Ins. v. Conemaugh Health Sys., Inc.*, 423 F. Supp. 3d 139, 150 (W.D. Pa. 2019). Defendants' only argument is that Etimine USA has not alleged specific damages to support its breach of contract claim. (ECF No. 21, pp. 17–19). But Etimine USA need not speculate specific damages for now. *Wachovia Bank, N.A. v. Ferretti*, 935 A.2d 565, 572 (Pa. Super. 2007). "Damages are only speculative if the uncertainty concerns the fact of damages rather than the amount." *Liberty Bank v. Ruder*, 587 A.2d 761, 765 (Pa. Super. 1991). In *Liberty Bank*, the Pennsylvania Superior Court reversed the trial court's dismissal and held that the plaintiff did not have to prove specific damage amounts at the pleading stage. *Id.*

11

Etimine USA has alleged that because Yazici has breached his Employment and Separation Agreements, it has suffered immediate irreparable harm including the loss of goodwill. (ECF No. 28, p. 22). The Court finds that Etimine USA need not specify more in its claim for damages.

## IV.     Plaintiff Adequately Alleged Claims for Conversion (Counts VII, VIII).

To state a claim for conversion of a trade secret, a plaintiff must allege that (1) it owns a trade secret; (2) the trade secret was communicated to the defendant within a confidential relationship; and (3) the defendant used the trade secret to the plaintiff's detriment. *Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 680 (E.D. Pa. 2018) (citing *Am. Hearing Aid Assocs. v. GN Resound N. Am.*, 309 F. Supp. 2d 694, 705 (E.D. Pa. 2004)). Etimine USA has alleged enough to implicate a misappropriation of a trade secret and, accordingly, for conversion of a trade secret. Etimine USA alleges that it communicated its trade secrets to Yazici as part of its confidential relationship. Etimine USA has alleged that Defendants have used the trade secret to its detriment. For these reasons, the Court finds Etimine USA has sufficiently pled for a claim of conversion of a trade secret.

**CONCLUSION**

For all these reasons, Defendants' 12(b)(6) Motion to Dismiss (ECF No. 20) will be denied.

An Order of Court will follow.[2]

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

3/24/21
Dated

---

[2] Etimine USA has requested, and Defendants have challenged, a claim for exemplary damages or an award of attorneys' fees and costs.  The Court will entertain such a motion should it be filed.